**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| COX ENTERPRISES, INC.; COX COMMUNICATIONS, INC.; and COXCOM, INC.,<br>Plaintiffs,<br>v.<br>HISCOX INSURANCE COMPANY, INC., AND ACE AMERICAN INSURANCE COMPANY,<br>Defendants. | Civil Action No.<br>1:24-cv-01777-SDG |

# OPINION AND ORDER

This matter is before the Court on three separate motions for summary judgment filed by the parties [ECFs 54, 56, 59]. For the following reasons and with the benefit of oral argument, Defendants Hiscox and ACE's motions for summary judgment [ECFs 54, 56] are **GRANTED**. Cox's motion for summary judgment [ECF 59] is **DENIED**.[1]

## I. INTRODUCTION

### A. Factual Background

This case arises from an insurance dispute. In 2011, Hiscox issued a Multimedia Liability Policy to Cox for the policy period of December 1, 2011 to

[1] Cox Enterprises, Inc., Cox Communications, Inc., and CoxCom, Inc. filed their motion for summary judgment collectively as "Cox." ECF 60-1 at 8.

December 1, 2012.[2] Also in 2011, ACE issued an Excess Liability Policy to Cox, which was intended to provide supplemental coverage in accordance with the Hiscox Policy.[3] The Hiscox Policy stated that Hiscox:

> will indemnify [Cox] for defense costs and damages incurred as a result of a claim that falls within WHAT HAS TO GO WRONG (Section II) under this policy . . . .[4]

Section II of the Hiscox Policy stated that Hiscox would provide coverage for instances when:

> The performance of media activities by [Cox] or anyone on [Cox's] behalf during the policy period results in a claim against [Cox] that arises from covered media . . . .[5]

In November 2014, Cox was sued by BMG Rights Management (US) LLC and Round Hill Music LP in the Eastern District of Virginia for contributory and vicarious copyright infringement.[6] BMG and Round Hill alleged that Cox, as an internet service provider, provided the "site and facilities necessary for" its subscribers to illegally pirate BMG and Round Hill's copyrighted music, and that upon learning of its subscribers' repeated infringement, Cox failed to take action

---

2 ECF 64-1, ¶ 1; ECF 68, ¶ 1; ECF 63-2, ¶ 38; ECF 63-3, ¶ 1.

3 ECF 64-1, ¶¶ 16, 18; ECF 68, ¶¶ 16, 18; ECF 63-2, ¶¶ 49, 54.

4 ECF 64-1, ¶ 4; ECF 63-2, ¶ 40.

5 ECF 64-1, ¶ 7; ECF 68, ¶ 7; ECF 63-2, ¶ 40; ECF 63-3, ¶ 4.

6 ECF 64-1, ¶¶ 20–21; ECF 68, ¶¶ 20–21; ECF 63-2, ¶¶ 3, 9; ECF 63-3, ¶¶ 32, 35.

to suspend these users or otherwise stop their infringement activities.[7] In granting partial summary judgment in favor of BMG and Round Hill on the issue of whether Cox fell within the "safe harbor" of the Digital Millenium Copyright Act, the trial court found that Cox had not "adopted and reasonably implemented . . . a policy that provides for the termination in appropriate circumstances of subscribers . . . who are repeated infringers," and this judgment was later upheld by the Fourth Circuit.[8] In a December 2015 jury trial, Cox was found liable for willful contributory copyright infringement, and BMG was awarded $25 million in addition to over $8 million in fees and costs.[9]

In May 2015, six months after the complaint by BMG and Round Hill against it was filed, Cox notified Hiscox of that lawsuit and sought coverage for its litigation costs.[10] One month later, Hiscox denied coverage, stating that the Hiscox Policy "was not intended to cover Cox's operations as an [Internet Service Provider]."[11] Hiscox further stated that BMG/Round Hill's claims against Cox did not meet the requirement that they arise from Cox's "performance of media

---

7 ECF 64-1, ¶¶ 22–27; ECF 68, ¶¶ 22–27; ECF 63-2, ¶¶ 4–7, 9; ECF 63-3, ¶¶ 32–35.

8 ECF 64-1, ¶¶ 28, 30; ECF 68, ¶¶ 28, 30; ECF 63-2, ¶ 13; ECF 63-3, ¶¶ 47, 53.

9 ECF 64-1, ¶¶ 33, 35; ECF 68, ¶¶ 33, 35; ECF 63-2, ¶ 11; ECF 63-3, ¶ 51.

10 ECF 64-1, ¶ 46; ECF 68, ¶ 46; ECF 63-3, ¶ 39.

11 ECF 64-1, ¶ 49; ECF 68, ¶ 49; ECF 63-2, ¶ 59; ECF 63-3, ¶¶ 42–43.

activities"[12] because the BMG/Round Hill lawsuit "does not allege that Cox 'produced or disseminated' any infringing files"[13] and rather "is limited to Cox's passive failure to prevent the dissemination of the infringing files by its . . . subscribers."[14] Hiscox's denial also noted that "Hiscox was not immediately notified of" the lawsuit but that Hiscox was "not disclaim[ing] coverage based on

---

12 The Hiscox Policy defined "media activities" as:

> 1. the gathering, acquisition, investigation, collection, researching, creation and compilation of media content;
> 2. any broadcast, transmission, dissemination, telecast, cablecast, syndication, serialization, podcast, streaming, or production of media content;
> 3. any publication, republication, or dissemination of media content including any special editions or supplements to such media content;
> 4. any digital, online, or electronic dissemination of media content;
> 5. the release, distribution, licensing, sale, lease, or exhibition of media content; regardless of the mode or method of communication of such media content.

ECF 64-1, ¶ 8; ECF 68, ¶ 8; ECF 63-2, ¶ 41; ECF 63-3, ¶ 5.

13 The Hiscox Policy defined "covered media" as "[a]ll publications, programming and other communications . . . produced or disseminated by you . . . ." ECF 64-1, ¶ 10; ECF 68, ¶ 10; ECF 63-2, ¶ 44; ECF 63-3, ¶ 7.

14 ECF 64-1, ¶ 53; ECF 68, ¶ 53.

late notice" because of Cox's representation that "none of [Cox's] relevant [employees] were aware of the suit until recently."[15]

In February 2016, fifteen months after the complaint against it was filed, Cox informed ACE of the BMG/Round Hill lawsuit, similarly seeking litigation costs.[16] In May 2016, ACE denied coverage, in part, because the BMG/Round Hill action "does not involve any publication, programming or other communications produced or disseminated by [Cox] as required by the policy."[17] ACE further cited Cox's "[failure] to give notice of the claim as soon as practicable" as a reason that "may" negate coverage.[18]

**B. Procedural Background**

On April 24, 2024, Cox initiated this lawsuit by filing its complaint against Hiscox and ACE, bringing a claim for breach of contract stemming from Hiscox and ACE's denial of coverage.[19] On October 10, 2025, Cox, Hiscox, and ACE all filed separate motions for summary judgment, and the motions have been fully

---

15 ECF 64-1, ¶ 56; ECF 68, ¶ 56; ECF 63-3, ¶ 44. The Hiscox Policy included language that Cox was obliged to "notify [Hiscox] of claims against [Cox] as soon as practicable after such claim is first made. . . ." ECF 64-1, ¶ 12; ECF 68, ¶ 12; ECF 63-2, ¶ 47.

16 ECF 64-1, ¶ 59; ECF 68, ¶ 59; ECF 63-2, ¶ 56.

17 ECF 64-1, ¶ 62; ECF 68, ¶ 62; ECF 63-2, ¶ 61.

18 ECF 64-1, ¶ 63; ECF 68, ¶ 63.

19 ECF 1.

briefed by the parties.[20] The Court held oral argument on July 20, 2026.[21] The motions are ripe for resolution.

## II. LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. Cox has brought a breach of contract claim against Hiscox and ACE based on their denial of coverage under the Hiscox Policy.[22] In Georgia, "[t]he essential elements of a breach of contract claim are (1) a valid contract; (2) material breach of its terms; and (3) damages arising therefrom." *Brooks v. Branch Banking & Tr. Co.*, 107 F. Supp. 3d 1290, 1295 (N.D. Ga. 2015) (citation omitted).[23]

Much of the parties' dispute focuses on disagreements over the meaning of terms in the Hiscox Policy, and whether Hiscox and ACE breached their contractual obligation to cover Cox's costs related to the BMG/Round Hill lawsuit.[24] Ordinary rules of contract construction govern the interpretation of insurance policies. *See Bituminous Cas. Corp. v. Advanced Adhesive Tech., Inc.*, 73 F.3d

---

20 ECFs 54, 56, 59, 63, 64, 66, 70, 71, 72.

21 ECF 86.

22 ECF 1.

23 The parties do not dispute that Georgia law applies to Cox's breach of contract claims, and that the Hiscox Policy includes an endorsement that it is "governed by the laws of the State of Georgia . . . ." ECF 64-1, ¶ 11; ECF 68, ¶ 11.

24 ECFs 54, 56, 59.

335, 337 (11th Cir. 1996). Georgia law is clear that "construction [of a contract] is a matter of law for the court." *Envision Printing, LLC v. Evans*, 336 Ga. App. 635, 638 (2016) (quoting *Gen. Steel v. Delta Bldg. Sys.*, 297 Ga. App. 136, 138 (2009)); *see also Gans v. Ga. Fed. Sav. & Loan Ass'n*, 179 Ga. App. 660, 662 (1986) ("It is ordinarily the duty of the court to interpret a contract as a matter of law."). The Court may also interpret insurance policies as a matter of law. "[T]he interpretation of an insurance policy, including the determination and resolution of ambiguities, is a question of law for the court to decide." *Giddens v. Equitable Life Assur. Soc. of U.S.*, 445 F.3d 1286, 1297 (11th Cir. 2006).

The Court is tasked with first examining the four corners of the agreement to ascertain the meaning of the contract. *See Brogdon v. Pro Futures Bridge Cap. Fund, L.P.*, 260 Ga. App. 521, 523 (2003); O.C.G.A. § 13-2-2(2) ("Words generally bear their usual and common signification; but technical words, words of art, or words used in a particular trade or business will be construed, generally, to be used in reference to this peculiar meaning."); *see also King v. GenOn Energy Holdings, Inc.*, 323 Ga. App. 451, 455 (2013) ("[T]he usual and common meaning of a word may be supplied by common dictionaries.") (citation omitted). When interpreting insurance contracts in particular, courts should "ascertain the parties' intention by examining the contract as a whole." *Lyons v. Allstate Ins. Co.*, 996 F. Supp. 2d 1316, 1319 (N.D. Ga. 2014).

## III. DISCUSSION

Across the three separate motions, the parties' arguments revolve around three key questions: (1) whether BMG/Round Hill's claims against Cox qualified for coverage under the Hiscox Policy; (2) whether any policy exclusions precluded coverage; and (3) whether Hiscox is now entitled to assert its defense that Cox failed to timely notify it of BMG/Round Hill's claims. As a further point of contention, the parties dispute whether Cox is entitled to prejudgment interest. Applying the summary judgment standard and Georgia's rules of contract interpretation, the Court will address these arguments in turn.

### A. Coverage for BMG/Round Hill's Claims

All the parties move for summary judgment on the issue of whether BMG/Round Hill's claims against Cox were eligible for coverage under the Hiscox Policy.[25] The parties make various arguments as to whether the claims meet the Hiscox Policy's definition for coverage, but their main quarrel can be distilled to a dispute over the term "disseminated" as used in the policy and that term's relationship to the requirement that covered claims arise from Cox's "performance of media activities."[26] While the parties spill significant ink arguing semantics about the word "disseminate," they have, in the Court's view, missed the forest

---

25 ECF 55, at 26; ECF 57-1, at 14; ECF 60-1, at 25.

26 *Id.*

for the trees. While the term "disseminate" might be ambiguous in isolation, its meaning is clear when viewed in the context of the entire contract. *See* O.C.G.A. § 13-2-2(4) ("The construction which will uphold a contract in whole and in every part is to be preferred, and the whole contract should be looked to in arriving at the construction of any part."). When viewed in its entirety, it is clear that the Hiscox Policy does not contemplate coverage for BMG/Round Hill's claims, regardless of the parties' dispute over the term "disseminate."

### 1. The Purpose of the Hiscox Policy

Even before focusing on specific coverage language, the record reflects that the Hiscox Policy in name, function, and purpose is strictly a "multimedia policy" designed to cover claims arising only in limited contexts related to Cox's own media activities. For example, in its description of claims arising from the "performance of media activities," the Hiscox Policy qualifies instances of infringement and misappropriation as pertaining to "content, formats, characters, trade names, character names, titles, plots, musical compositions, voices, slogans, graphic material or artwork."[27] This laundry list of creative content reflects an intent to cover claims where Cox's own original media productions or communications infringed on copyrighted intellectual property. Further, in its definition of "media activities," the Hiscox Policy lists Cox's "broadcast,

27 ECF 54-3, at 40.

transmission . . . telecast, cablecast, syndication, serialization, podcast, streaming, or production," in addition to "dissemination," further evidencing that "media activities" was only intended to cover Cox's distribution of its own creative or original content.[28] *See Gustafson v. Alloyd Co.*, 513 U.S. 561, 562 (1995) ("A word is also known by the company it keeps."). Looking at the Hiscox Policy as a whole, it is reasonable to conclude that it was intended to cover Cox's activities in producing and broadcasting original media productions and communications, rather than Cox's provision of internet services to its subscribers.

**2. The Performance of Media Activities**

***i.* By or on Behalf of Cox**

Next, focusing on the specific coverage language, the Hiscox Policy only provides coverage for claims arising from the "performance of media activities by [Cox] or anyone on [Cox's] behalf . . . ."[29] It further contains a fairly expansive definition of "media activities" that includes the "broadcast, transmission, [and] dissemination . . . of media content."[30] Media content is defined as the "substance of any communication of any kind whatsoever with covered media," with covered

28 *Id*. at 46.

29 ECF 64-1, ¶ 7; ECF 68, ¶ 7; ECF 63-2, ¶ 40; ECF 63-3, ¶ 4.

30 ECF 64-1, ¶ 8; ECF 68, ¶ 8; ECF 63-2, ¶ 41; ECF 63-3, ¶ 5.

media defined as "[a]ll publications, programming and other communications . . . produced or disseminated by [Cox]."[31]

The parties zero in on these individual provisions, and specifically, the term "disseminate" in their arguments for and against coverage. For example, Cox argues in favor of coverage by asserting that it qualifies as a "passive disseminator" of the copyrighted material because it supplied its users with the network necessary for them to infringe and failed to stop them from doing so.[32] Cox goes as far as arguing that BMG/Round Hill's claims against it should qualify for coverage because its provision of internet services was the "but-for cause" of its liability in the underlying case.[33] However, even if Cox could be considered a passive "disseminator" of the infringing material in an abstract sense of the word, Cox cannot escape the Hiscox Policy's overarching requirement that coverage-eligible claims must involve a "performance of media activities" by Cox itself, or

---

31 ECF 64-1, ¶¶ 9–10; ECF 68, ¶¶ 9–10; ECF 63-2, ¶¶ 42, 44; ECF 63-3, ¶ 7. Specifically, the Hiscox Policy defined "media content" as "the substance of any communication of any kind whatsoever within covered media or advertising, regardless of the nature or form of such 'media content' or the medium by which such 'media content' is communicated, including but not limited to language, data, facts, fiction, music, photographs, images, advertisements, artistic expression, or visual or graphical materials." ECF 64-1, ¶ 9; ECF 68, ¶ 9; ECF 63-2, ¶ 42.

32 ECF 63, at 19.

33 *Id*. at 29.

a performance by someone else on its behalf or for its benefit. BMG/Round Hill's claims against Cox did not allege this, and at most, were premised solely on the actions of others for their own benefit and Cox's inaction to stop them. Accordingly, such claims are not eligible for coverage under the Hiscox Policy.

A common-sense reading of the policy makes clear that a determination of a claim's eligibility for coverage starts by asking whether the claim arose from the "performance of media activities." Because the Hiscox Policy does not provide a definition of "performance," it is given its "plain, ordinary, and popular meaning as supplied by [a] dictionary." *State Farm Fire & Cas. Co. v. Bauman*, 313 Ga. App. 771, 774 (2012). Merriam-Webster's Dictionary defines "performance" as "the execution of an action."[34] The American Heritage Dictionary defines "perform" as "[to] take action in accordance with the requirements of."[35]

Taking these plain meanings of the term "performance" into account, the requirement that the "performance of media activities" be "by [Cox]" or by "anyone on [Cox's] behalf" unambiguously necessitates that, for a claim to qualify for coverage, Cox must itself act to perform media activities or someone else must

---

34 *Performance,* MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/performance [https://perma.cc/T32N-BMZV] (last visited Sept. 21 2026).

35 *Perform*, AM. HERITAGE DICTIONARY (5th ed. 2022), https://ahdictionary.com/word/search.html?q=perform [https://perma.cc/R9FE-QBY4] (last visited Sept. 21, 2026).

act to perform media activities on its behalf or for its benefit. Here, as stated in BMG/Round Hill's complaint, their claims against Cox arose not from any performance on Cox's part, but merely from Cox's furnishing of the "pipes, system, and . . . technology" its subscribers needed to infringe on BMG/Round Hill's copyrights, and Cox's failure to stop them.[36] Indisputably, Cox "materially contribute[d] to its subscribers' direct infringement" by providing the digital infrastructure over which internet users sent infringing material.[37] Indeed, without Cox's internet network, the infringement alleged by BMG/Round Hill could not have occurred. However, those claims do not allege any "performance" by or on behalf of Cox in any sense of the word. It is undisputed that BMG/ Round Hill did not contend that Cox itself uploaded or downloaded any of the copyrighted material as part of the peer-to-peer file sharing system that its subscribers used to infringe.[38] Nor is there any indication from BMG/Round Hill's allegations that Cox was understood to be anything other than a provider of internet subscriptions and "the site and facilities necessary for its *subscribers,*" rather than Cox itself, "to commit direct infringement."[39]

---

36 ECF 64-1, ¶¶ 22–27; ECF 68, ¶¶ 22–27; ECF 63-2, ¶¶ 4–7, 9; ECF 63-3, ¶¶ 32–35.

37 *Id*.

38 ECF 63-2, ¶ 33.

39 ECF 64-1, ¶ 22; ECF 68, ¶ 22.

It further belies fact and logic to conclude that Cox's subscribers committed infringement on Cox's behalf or for Cox's benefit. Rather, their "performance" was merely a reciprocal exchange between one internet user to another, without any active contribution by or for Cox. BMG/Round Hill's allegations that Cox failed to stop its subscribers from infringing are necessarily premised on Cox's repeated *inaction*. In sum, BMG/Round Hill asserted that Cox simply provided the "pipes" through which its subscribers infringed and failed to stop that infringement—Cox did nothing to "perform media activities" as required under the Hiscox Policy.

***ii.* Passive Dissemination**

Despite the parties' arguments, the analysis above makes clear that a determination of whether Cox "disseminated" the copyrighted material is not the linchpin for purposes of determining whether there is coverage under the Hiscox Policy. However, even if the Court had found "dissemination" important in determining coverage, Cox's arguments still fall flat because the record in this case overwhelmingly undermines Cox's position that it is eligible for coverage as a "passive disseminator."

First, Cox relies heavily on testimony from Hiscox's expert witness, who posited that Cox might be considered a passive "disseminator" of information if it hypothetically "hosted a message board that it knew its users were allowed to post

information . . . and users did post that information . . . ."[40] While Cox attempts to argue that this hypothetical role is analogous to its own, this testimony actually supports the position that BMG/Round Hill's claims are not eligible for coverage because neither Cox, nor its subscribers on its behalf, took any action to "perform media activities" that led to infringement.

For example, when questioned further on "the difference between a message board and sending files across the internet," the same expert witness stressed "it comes back to the fact that Cox . . . actively created a website that encouraged or facilitated user-generated content versus . . . passively transmitted similar user-generated content across its internet."[41] In other words, Cox's passive furnishing of the "pipes" over which copyrighted information was improperly shared by others stands in stark contrast to a hypothetical situation in which Cox performed an action to affirmatively create, host, and encourage media activity on its own digital forum. Elsewhere, Hiscox's expert affirmed that coverage under the Hiscox Policy hinges only on the "performance of media activities" alone and not on whether Cox qualifies as a "passive disseminator." She testified that the Hiscox Policy was only "designed to cover liability that arises out of content created by or on behalf of the insured and then the corresponding media activities

---

40 ECF 64-1, ¶ 54; ECF 68, ¶ 54.

41 *Id.*

relating to that content" and that "services as an internet service provider aren't traditionally covered under a media liability policy."[42] Put simply, both the Hiscox Policy's language and defense expert witness testimony indicate that the purpose and meaning of the Hiscox Policy require "performance of media activities" and simply do not contemplate Cox's overwrought position that it is qualified for coverage as a "passive disseminator."

Cox's argument that it is a "passive disseminator" eligible for coverage is further undermined by a strikingly similar case decided by another judge in this District involving the *very same* parties arguing insurance claims under the *very same* policy. In *Cox Enterprises, Inc. v. Hiscox Insurance Co.*, Cox sued Hiscox for breach of contract stemming from Hiscox's denial of insurance claims for litigation costs accrued in an underlying lawsuit. 478 F. Supp. 3d 1335, 1337 (N.D. Ga. 2020). In that underlying lawsuit, two Cox employees were accused by professional wrestler Terry Bollea (a.k.a. Hulk Hogan) of leaking his home videos to tabloid websites, which later published them. *Id.* at 1338–40. Similar to the case at hand, the parties disputed whether Cox qualified as a "disseminator" of the home videos under the terms of the policy. *Id.* at 1341. Relying on several dictionary sources, the court proffered various definitions of the term disseminate, including "[t]o

---

42 ECF 63-3, ¶¶ 10, 12.

spread abroad; promulgate," "to spread abroad as though sowing seed," and "[t]he act of spreading, diffusing, or dispersing," before concluding that "disseminate means spreading or circulating information." *Id*. at 1344 (citation omitted). The court ultimately found that Cox "disseminated" the videos because its employees "worked in concert and conspired to leak and sell information." *Id*. In particular, the court focused on the Cox employees' affirmative actions in "spread[ing] the Footage and plac[ing] it in circulation" and sending the video to journalists "while intending and knowing that [the editor] would post the Footage online," even though the employees did not publish the home videos themselves. *Id*. Taken together, a fair reading of the court's opinion reflects that, in concluding the claims were covered, it relied heavily on allegations that the employees intentionally and affirmatively put forth the information into the public sphere in determining that they had "disseminated" the video.

Both sides argue that this prior ruling supports their coverage arguments.[43] Cox loses this battle. It cannot show that BMG/Round Hill's claims were premised on any action it took to intentionally or affirmatively disseminate the copyrighted material. Unlike the Cox employees in the Hulk Hogan case, who affirmatively "worked in concert" to "place[] the video in circulation," Cox here did not perform

43 ECF 57-1, at 19; ECF 60-1, at 19; ECF 63, at 23.

an action and certainly did not "perform media activities." *Id*. at 1344–45. Rather, at most, it failed to stop its subscribers from placing infringing material into circulation.

Cox further attempts to cement its role as a "passive disseminator" by arguing that it could not, as a matter of law, have been held liable for contributory copyright infringement in the underlying case unless it had been found to have disseminated the copyrighted material.[44] In support of its argument, Cox relies on a Fourth Circuit case which held that internet service providers "can become liable [for copyright infringement] indirectly upon a showing of additional involvement" beyond passively storing information, such as "transmitting" that information. *CoStar Grp., Inc. v. LoopNet, Inc*., 373 F.3d 544, 555 (4th Cir. 2004). However, Cox's generously inventive reading of *CoStar* provides no support for the idea that an internet service provider who "transmits" information "performs media activities" within the meaning of the Hiscox Policy. *Id*. at 551. In fact, *CoStar* actually confirms the role of internet service providers as a mere conduit of information, rather than a "performer of media activities," noting that internet

---

44 ECF 63, at 23.

service providers do "nothing more than setting up and operating a system that is necessary for the functioning of the Internet." *Id*. at 548 (citation omitted).[45]

### 3. Internet Service Providers (ISPs)

Beyond its "passive disseminator" arguments, Cox asserts an additional argument that the Hiscox Policy implicitly provides coverage for "internet service provider services" because a "technology activities" endorsement separate from the media liability portion of the policy specifically excludes coverage for these services.[46] Cox asserts that, because the media liability portion of the Hiscox Policy does not expressly exclude coverage for ISP services, it must allow it.[47] However, this argument inverts logic. The endorsement specifically pertains to coverage for

---

45 Cox's own characterizations of its role as merely an internet service provider in previous lawsuits are a direct about face from its current position that its role as a "passive disseminator" qualifies it for coverage. The undisputed facts show that Cox has represented itself before other federal courts, including the United States Supreme Court, as merely a conduit of information rather than a performer of media activities. In an appellate brief filed before the Supreme Court as part of the BMG/Round Hill litigation, Cox stated that it "did not engage in a single affirmative act with the purpose of furthering infringement," and that it "simply provided [the] communications infrastructure" for its users at "arm's length" with no ability "to control or monitor user behavior." ECF 63-2, ¶ 37; ECF 63-3, ¶ 70. In a particularly exemplary statement, Cox essentially described itself as a disinterested third party to the infringement, "[j]ust as an electric company cannot ensure its wattage does not power an infringer . . . ." ECF 63-2, ¶ 37. These statements unequivocally show that even Cox understood that it did not "perform" any media activities as contemplated by the Hiscox Policy.

46 ECF 60-1, at 31.

47 *Id*.

"technology activities," which by definition could reasonably include "internet service provider services." The media liability portion of the Hiscox Policy, on the other hand, is a separate provision and only provides coverage for the "performance of media activities," not for ISP services. Accordingly, the fact that the "technology activities" endorsement discretely excludes coverage for these such services underscores the interpretation that the media liability portion of the policy never even contemplated coverage for ISP services in the first place. Cox's argument in this regard is unpersuasive.

**4. Duty to Defend**

Finally, and somewhat separate from the parties' policy language arguments, Cox argues that Hiscox and ACE breached their general "duty to defend" by failing to cover Cox's litigation costs.[48] However, the Hiscox Policy included a disclaimer that it is "not a duty to defend policy . . . [Cox has] the duty to defend claims on [Cox's] own behalf under this policy."[49]

**5. Summary**

"[A]n insured claiming an insurance benefit has the burden of proving that a claim falls within the coverage of the policy." *Travelers Home & Marine Ins. Co. v. Castellanos*, 297 Ga. 174, 176 (2015) (citation modified). Because Cox cannot show

---

48 *Id*. at 32.

49 ECF 64, at 23; ECF 63-3, ¶ 14.

that it performed media activities, or that someone else did so on its behalf, it cannot show that BMG/Round Hill's claims against it were entitled to coverage. Accordingly, Cox is not entitled to summary judgment on its claim, and its motion for summary judgment is denied. Conversely, Hiscox and ACE are entitled to summary judgment, and their motions for summary judgment are granted.

### B. Exclusions

While the above coverage analysis is dispositive, the parties provide further arguments that the Court finds prudent to address. Hiscox and ACE move for summary judgment on whether BMG/Round Hill's claims against Cox were precluded from coverage under the Hiscox Policy's Exclusion c. and Exclusion r.[50]

#### 1. Exclusion c. — Fraudulent, Dishonest, or Illegal Conduct

As to Exclusion c., the parties dispute whether Hiscox intentionally engaged in fraudulent, dishonest, or illegal conduct and whether that conduct bars coverage.[51] Under this exclusion, the Hiscox Policy precluded payment for claims arising from "any fraudulent or dishonest conduct or willful violation of law, whether committed by you or by another whose actions you have ratified or

---

50 ECF 55, at 37; ECF 57-1, at 22.

51 ECF 55, at 37; ECF 63, at 32.

condoned."[52] The exclusion, however, is not triggered "until such conduct or violation has been established by final decision in a judicial . . . proceeding."[53]

It is undisputed that the Fourth Circuit, in affirming the partial summary judgment order of the district court in the underlying litigation, alluded to various instances of potential misconduct on Cox's part. For example, the Court of Appeals stated that Cox "made every effort to avoid reasonably implementing" its policy to remove subscribers after receiving notice that they were pirating copyrighted music.[54] *BMG Rts. Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 881 F.3d 293, 303 (4th Cir. 2018). In particular, the appellate court cited evidence that Cox employees had engaged in a scheme to reinstate suspended subscribers to "collect a few extra weeks of payments for their account," and declined to cancel subscribers' accounts "because it did not want to lose revenue."[55] *Id.* at 303, 305. However, the Fourth Circuit did not hold that Cox had engaged in any "fraudulent or dishonest conduct or willful violation of law" as contemplated by Exclusion c. Rather, the court merely determined that Cox had failed to implement "a policy that provides for

---

[52] ECF 63-3, ¶ 22.

[53] *Id.*

[54] *Id.* ¶ 58.

[55] *Id.* ¶ 59.

the termination [of subscribers] in appropriate circumstances." *Id.* (citation omitted).

Indeed, here, the parties dispute the level of surveillance, knowledge, and control that Cox had over the activities of its infringing subscribers, and whether its inaction to stop those subscribers triggered Exclusion c. For example, the record evidence shows that Cox could not "monitor its subscribers for activity that potentially infringes on copyright" and did not "have any systems that review the content of subscribers['] activities on the Internet for potential copyright infringement."[56] Further, the parties dispute whether Cox ever reviewed the content of the infringing material.[57] Finally, the parties dispute whether Cox had the ability to "selectively determine what kind of data customers could or could not download" and whether it could suspend a customer based on the customer's internet activity.[58] These unresolved factual questions preclude this Court from ruling as a matter of law that exclusion c. was triggered.

**2. Exclusion r. — the Policy Period**

Next, as to Exclusion r., the parties dispute whether BMG/Round Hill's claims against Cox are barred to the extent they arose prior to when the Hiscox

56 *Id.* ¶ 62.

57 *Id.* ¶ 64.

58 *Id.* ¶ 66.

and ACE Policies became effective.[59] Under this exclusion, Hiscox would not pay for any claim that "has been or properly could have been the subject of notice to any insurance carrier prior to the policy period."[60] Further, the Hiscox Policy defined "claim" as "any written assertion of liability or any written demand for financial compensation or injunctive relief."[61]

Here, the undisputed facts show that, as early as June 2011, Cox received "notices of actual, documented infringement" by its subscribers.[62] Further undisputed communications from that time show that these notices warned that "[Cox] cannot ignore [the law]. And [the owner of the copyrighted material] intend[s] to test you on it."[63] These written notices concerned infringement claims that indisputably arose before the policy period for the Hiscox Policy began in December 2011. The policy stated that, "where a claim or multiple claims arise from a series of the same, or substantially the same factually or logically related events . . . they will all be deemed to have been performed on the date of the very first dissemination or act."[64] Accordingly, BMG/Round Hill's claims that arose

---

59 ECF 55, at 38; ECF 57-1, at 22; ECF 63, at 36.

60 ECF 63-2, ¶ 48; ECF 63-3, ¶ 23.

61 ECF 63-2, ¶ 46.

62 *Id*. ¶ 19.

63 *Id*.

64 ECF 63-3, ¶ 24.

during the Hiscox Policy period might be factually similar enough to those earlier claims to be deemed to arise from acts of infringement occurring outside the policy period.

However, whether these two sets of claims are sufficiently factually connected to trigger Exclusion r. is unclear from the record. Nor is it clear whether the later claims "could have been the subject of notice" under a previous policy.[65] In other words, there are disputes of material fact as to whether the pre-policy period claims established a continuum of claims that includes BMG/Round Hill's later claims, or alternatively whether the earlier and later sets of claims constituted separate torts existing under two (or more) separate policies. These disputes preclude summary judgment on this issue.

* * * *

In sum, because factual disputes permeate whether these policy exclusions apply, Hiscox and ACE are not entitled to summary judgment on this basis.

**C. Late-Notice Defense**

Next, Cox and Hiscox move for summary judgment on whether Hiscox is now entitled to assert as a defense that Cox failed to timely notify the insurers about BMG/Round Hill's claims, or conversely, whether they have waived that

---

65 *Id.* ¶ 23.

defense.[66] The Hiscox Policy included a late-notice provision that Cox "must notify [Hiscox] of claims against [Cox] as soon as practicable after such claim is first made," and that Hiscox will "not make any payment in connection with any claim unless we are notified in accordance with" this notification requirement.[67] Generally, "a notice provision expressly made a condition precedent to coverage is valid and must be complied with." *Travelers Cas. & Sur. Co. of Am. v. Rosser Int'l, Inc.*, No. 1:22-CV-01647-SEG, 2023 WL 12015529, at *4 (N.D. Ga. Oct. 31, 2023) (citation omitted). Hiscox therefore asserts that it may now invoke Cox's delayed notification of BMG/Round Hill's claims as a defense to coverage, despite initially denying coverage on other bases.[68] On the other hand, Cox argues that Hiscox waived this defense because Georgia law prohibits insurers from reserving defenses after denying coverage altogether.[69]

Hiscox's argument ultimately boils down to whether, at the time it denied coverage of Cox's claims, it reserved its right to assert its late-notice defense. "A reservation of rights is a term of art in insurance vernacular and is designed to

---

66 ECF 55, at 17; ECF 60-1, at 34; ECF 63, at 45. While ACE addressed this argument in its briefing, ACE did not move for summary judgment on this basis. ECFs 56, 65, 74.

67 ECF 64-1, ¶ 12; ECF 68, ¶ 12; ECF 63-2, ¶¶ 40, 47; ECF 63-3, ¶ 20.

68 ECF 55, at 19.

69 ECF 60-1, at 34; ECF 63, at 45.

allow an insurer to provide a defense to its insured while still preserving the option of litigating and ultimately denying coverage." *Hoover v. Maxum Indem. Co.*, 291 Ga. 402, 405 (2012). However, "a reservation of rights is only available to an insurer *who undertakes a defense* while questions remain about the validity of the coverage." *Id.* (emphasis added). In other words, "[a]n insurer cannot both deny a claim outright and attempt to reserve the right to assert a different defense in the future." *Id*. This notion has been reiterated again and again by both state and federal courts in Georgia, including this Court. *See SavaSeniorCare, LLC v. Starr Indem. & Liab. Co*., 491 F. Supp. 3d 1275, 1285 (N.D. Ga. 2020) ("Once the Insurers denied coverage . . . they forfeited the right to raise additional or alternative defenses."); *G.M. Sign, Inc. v. St. Paul Fire & Marine Ins. Co*., 677 F. App'x 639, 642 (11th Cir. 2016) ("Georgia law holds that an insurer's denial of coverage under a policy waives the notice requirements under that policy."); *Am. Safety Indem. Co. v. Sto Corp*., 342 Ga. App. 263, 268 (2017) ("[U]nder *Hoover*, [an insurer] cannot both deny the claims and assert a reservation of rights, and we fail to see how a previous reservation of rights issued while [insurer] was still investigating the claims would remain effective post-denial.").

Normally then, under the rule in *Hoover*, the insurers would be barred from asserting a previously reserved defense because it denied coverage outright. However, the record here presents factual disputes that complicate whether

*Hoover*'s seemingly brightline prohibition should apply in this instance. The parties appear to agree that Hiscox's denial letter stated that Cox did not immediately notify it of BMG/Round Hill's claims, but explained that Hiscox was not denying coverage on that basis because Cox had represented that "none of the relevant individuals [at Cox] were aware of the suit until recently."[70] The parties now dispute the timeline as to when Cox knew about BMG/Round Hill's claims against it and whether its statement to Hiscox about the timing was true.

For example, while Hiscox points to facts that indicate Cox learned about and had entered appearances in the BMG/Round Hill lawsuit six months before it gave Hiscox notice, Cox argues that its executive team was not "aware" of the lawsuit until the time it eventually notified Hiscox in mid-2015.[71] Hiscox asserts that Cox's risk manager read press articles about the BMG/Round Hill lawsuit as early as December 2014, but Cox counters with testimony from its risk manager that she "did not see the [BMG complaint] or really know anything about it until" immediately before presenting BMG/Round Hill's claims to Hiscox in May 2015.[72]

These factual disputes call into question the timeline of when Cox became aware of BMG/Round Hill's claims against it. While Cox argues that Hiscox's

---

70 ECF 63-3, ¶ 44.

71 *Id*. ¶ 38.

72 *Id*. ¶ 36.

denial of coverage is "all that matters" in determining whether Hiscox can reserve a late-notice defense under *Hoover*, this argument defies logic and basic principles of fairness if it turns out that Hiscox was affirmatively deceived by Cox into not asserting a timeliness defense in the first place.[73] What Cox knew and when it knew it are important facts that must be resolved before making any determination about whether the late-notice exclusion applies.

Accordingly, genuine disputes of material fact as to when Cox knew about BMG/Round Hill's claims against it and whether its representations to Hiscox were true preclude summary judgment on whether Hiscox waived its late-notice defense and whether Cox failed to comply with the Hiscox Policy's notice provision.

**D. Prejudgment Interest**

Finally, Cox moves for summary judgment on its entitlement to prejudgment interest.[74] Because BMG/Round Hill's claims against Cox are not eligible for coverage, Cox is not entitled to judgment on its claims in this case, and thus its arguments for prejudgment interest are moot.[75]

---

[73] ECF 71, at 26.

[74] ECF 60-1, at 40.

[75] Cox also asserts an argument that its settlement costs in the underlying case were reasonable, which Hiscox and ACE do not address in detail. *Id.* at 37. Because Cox is not entitled to summary judgment, this argument is also moot.

## IV. CONCLUSION

Hiscox and ACE's motions for summary judgment [ECFs 54, 56] are **GRANTED.** Cox's motion for summary judgment [ECF 59] is **DENIED**.

The Clerk is **DIRECTED** to enter judgment in favor of Defendants and against Cox, and to close this case.

**SO ORDERED** this 24th day of September, 2026.

Steven D. Grimberg
United States District Judge